UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL ROBERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-04110-JPH-DML |
| | ) | |
| DR. PAUL TALBOT; | ) | |
| WEXFORD of INDIANA, LLC; and | ) | |
| CORIZON MEDICAL SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Defendants' Motions for Summary Judgment
and Directing Entry of Final Judgment**

Pending before the Court are the motions for summary judgment of defendants Dr. Paul

Talbot and Wexford Health Sources (called Wexford of Indiana in the complaint), dkt. 80, and

defendants Corizon Medical Services and Dr. Talbot, dkt. 83. At all times relevant to this lawsuit,

Dr. Talbot was employed first by Corizon and thereafter by Wexford to provide medical services

at the Pendleton Correctional Facility (PCF) in Indiana. The Court recruited *pro bono* counsel for

Mr. Roberson, who filed a single response applicable to both motions. Dkt. 91. The defendants

filed separate replies and the motions are ready for decision. For the reasons explained in this

Order, both motions, dkt. [80] and dkt. [83] are **granted**.

**I. Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of

its motion and identifying those portions of designated evidence that demonstrate the absence of a

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After "a

properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Stokes v. Bd. of Educ.*, 599 F.3d 617, 619 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 248). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the Court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Stokes*, 599 F.3d at 619.

Instead, the Court accepts as true the evidence presented by the non-moving party, and all reasonable inferences must be drawn in the non-movant's favor. *Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 683 (7th Cir. 2017) ("We accept as true the evidence offered by the non-moving party, and we draw all reasonable inferences in that party's favor."). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

"As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotations omitted). "Such a dispute

exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof." *Id.* (citing *Packer v. Tr. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 847 (7th Cir. 2015)). The non-moving party bears the burden of specifically identifying the relevant evidence of record, and "courts are not required to scour the record looking for factual disputes." *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015).

Finally, a plaintiff opposing summary judgment may not inject "new and drastic factual allegations," but instead must adhere to the complaint's "fundamental factual allegation[s]." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014).

## II. Facts

Consistent with S.D. Ind. L.R. 56-1(e), the material facts asserted by the defendants are supported by designated evidence, that is, "citation to a discovery response, a deposition, an affidavit, or other admissible evidence."   Most of what's identified by the plaintiff as contested issues of material fact, in contrast, are not supported by citation to designated evidence. *See, e.g.,* Dkt. 91 at p. 2 (asserting that Dr. Talbot altered medical records).  Accordingly, except where specifically noted otherwise, the Court accepts the statements of undisputed material facts asserted by the defendants.  The facts are still, of course,  viewed in the light most favorable to Mr. Roberson as the non-moving party. *Whitaker*, 849 F.3d at 683.

### Background

At all times relevant to the complaint, Mr. Roberson was an inmate at PCF. He has been incarcerated by IDOC since 2011. Corizon was, and Wexford is, the employer of Dr. Talbot. These companies have contracts with the State of Indiana to provide health services to the inmates at PCF. Dr. Talbot provided health services to the PCF inmates. This action, commenced on

3

November 6, 2017, is proceeding on Mr. Talbot's January 8, 2018, Amended Complaint, dkt. 12-1, as screened on January 10, 2018. Dkt. 13.

**Mr. Roberson's medical conditions and allegations of deliberate indifference**

Mr. Roberson alleges that Dr. Talbot has been deliberately indifferent to Mr. Roberson's numerous medical conditions that include atrial fibrillation ("a-fib"), prostate and bladder issues, constipation, allergies, and eczema, and by denying him eye surgery, access to a cardiologist, and treatment from an outside gastroenterologist. Dkt. 82-1 (Roberson deposition) at pp. 20-22, 52.

At his deposition, Mr. Roberson testified that his a-fib started in 2015, and he thereafter saw a cardiologist multiple times and received medication for the condition. *Id.* at p. 28. Mr. Roberson also testified that he has not had an a-fib episode that required immediate medical attention since 2015. *Id.* at p. 29. He also testified that in 2016 he saw an ear, nose, and throat specialist who recommended a proton pump inhibitor as treatment. *Id.* at p. 33.

Mr. Roberson also testified that he did not know what caused his frequency of urination or urine leakage, but agreed that as reflected on his medical records, he had not brought these issues to Dr. Talbot's attention in several years  . *Id.* at pp. 41-43.

Mr. Roberson testified in his deposition that in addition to seeing a cardiologist several times, he has also seen a gastroenterologist and an ENT, received multiple EKGs, had an endoscopy, and received numerous medications. *Id.* at p. 52.

Mr. Roberson's only evidence to support his claims against Wexford is pointing to Dr. Talbot's "track record." *Id.* at p. 60. Mr. Roberson could not provide an example of something Dr. Talbot did or did not do that could support the "track record" allegation. *Id.*

Wexford and Dr. Talbot have submitted the affidavits of Dr. Kirk Parr and Dr. John Unison, who have opined that Dr. Talbot provided appropriate care and treatment to Mr. Roberson.

Dkt. 82-2; dkt. 83-3. However, neither affiant has ever treated or examined Mr. Roberson. Dkt. 90-1.

Other facts will be cited and discussed as necessary below.

### III. Discussion

#### A.    Corizon and Wexford

Mr. Roberson contends that Corizon and Wexford violated his Eighth Amendment rights when they hired Dr. Talbot because they knew he "would not properly treat [Mr. Roberson's] chronic/or existing medical conditions." Dkt. 12-1 (amended complaint) at pp. 4-5. He pled that Corizon and Wexford "knew and [were] aware that [Dr.] Talbot would deliberately and negligently commit malpractice." *Id.* at p. 5.

At his deposition, Mr. Roberson testified he was suing Wexford because it had hired Dr. Talbot, and it had "not complied with things that need to be done." Dkt. 82-1 at p. 21. He explained that he had been approved for an eye surgery, but that "Wexford's panel, whoever their panel is, decided that I don't meet the criteria for this eye surgery; and yet on all the paperwork it says I do meet the criteria." *Id.* Later in the same deposition, Mr. Roberson explained that Wexford should not have hired Dr. Talbot because of his "track record." *Id.* at p. 62. When asked to elaborate on what he meant by "track record," Mr. Roberson answered, "I'm still gathering information and will share that with you when I get it." *Id.*

Corizon and Wexford seek summary judgment on the basis that there is no evidence that either entity knew or should have known that Dr. Talbot would be deliberately indifferent to Mr. Roberson's serious medical needs. Wexford also contends that Mr. Roberson has not alleged a policy or practice of hiring physicians that it should have known would be deliberately indifferent to inmates' serious medical needs.

Because Wexford and Corizon act under color of state law by performing a government function – providing healthcare services to inmates – pursuant to a contract, each is treated as a government entity for purposes of § 1983 claims. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019). A successful claim against Wexford and/or Corizon therefore must be based on a policy, practice, or custom that gives rise to the alleged harm. *Id.*; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (en banc) ("The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents.")

Mr. Roberson's policy or practice claim in his amended petition was inferred by giving his *pro se* complaint a liberal reading. But on summary judgment, the "put up or shut up" phase of the case, *Grant*, 870 F.3d at 568, Mr. Roberson has not designated evidence to support his claim against either Corizon or Wexford so their motions for summary judgment are **granted**.

### B.    Dr. Talbot

As a convicted offender, Mr. Roberson's § 1983 claims against Dr. Talbot for deliberate indifference to his serious medical needs arise are evaluated under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Prison officials have a duty to provide humane conditions of confinement, which includes *adequate* medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on a claim of deliberate indifference to serious medical needs, Mr. Roberson must show that (1) he suffered from an objectively serious medical condition, and (2) the defendants knew about the condition and the

substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*) ("To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition."). The Seventh Circuit recently explained what is required to establish deliberate indifference:

> To prove deliberate indifference, mere negligence is not enough. A plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. The linchpin is a lack of professional judgment. A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. A prison medical professional faces liability only if his course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019) (internal citations and quotations omitted). Put another way, deliberate indifference means a culpable state of mind equivalent to criminal recklessness. *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016).

Mr. Roberson alleged that Dr. Talbot was deliberately indifferent in the following respects:

1.    Discontinuing or not renewing necessary medication or refusing to re-prescribe the medication to save Corizon's or Wexford's money.

2.    Discontinuing needed treatments.

3.    Substituting ineffective medications for effective medications.

4.    Denying the existence of some health issues.

5.    Misdiagnosing new and long-existing chronic medical conditions such as atrial fibrillation, eczema, and allergies.

6.    Failing to authorize or provide proper procedures and treatments for chronic health problems.

7.      Providing improper care.

8.      Denying care/treatment.

9.      Delaying and denying examinations by a specialist such as a cardiologist.

10.     Entering false or misleading information in his medical file, after the fact, to hide his mistakes.

11.     Ordering only basic tests, performed on site, rather than the better tests required to determine the nature and seriousness of his heart condition.

12.     Threatening to put him in lock-up to cover his own bad acts, and then doing so.

Dkt. 12-1 (amended complaint) at pp. 2-4.

Mr. Roberson pled deliberate indifference in his amended complaint, but in later filings and his deposition he repeatedly referred to Dr. Talbot's alleged conduct as negligence. Because negligence is not sufficient to support a § 1983 claim, the Court will consider Mr. Roberson has designed evidence to show a disputed genuine issue of material fact as to whether Dr. Talbot was deliberately indifferent to Mr. Roberson's serious medical needs. And while there is some suggestion that not all of Mr. Roberson's conditions meet the "serious medical need" standard, some do, and those are the conditions that Mr. Roberson focuses on in his filings and deposition. For clarity, the Court will discuss each topic area alleged in the amended complaint, in turn.

**1.      Discontinuing or not renewing necessary medication to save Corizon's or Wexford's money.**

Dr. Talbot argues there is no evidence that he was deliberately indifferent in prescribing Mr. Roberson's medications. At his deposition, Mr. Roberson testified at various points about his medications:

Q.  Do you know what medical condition you were suffering from that you were denied medication for?

A.  I believe one was prostrate issues and/or bladder. We've not discovered what the issue is. Huh. Allergies. Eczema. Huh. I can't recall any more at the moment.

Dkt. 82-1 at p. 14.

Q. Did those medicines that you were on for your prostate resolve your symptoms?
A. They helped a little, but we were systematically trying other things . . . .

*Id.* at p. 43.

Q. Was there ever a time frame in which you were receiving Colace and you stopped taking it?
A.  I don't recall.
Q.  So if the records say you stopped taking the Colace as prescribed, you would have no reason to dispute that?
A.  I believe once upon a time we tried different medications. I don't know that I stopped or refused to take them. I know we tried several different items to see if they were working better than others.

*Id.* at p. 48.

Q.  [W]hat is it that Dr. Talbot didn't do for the eczema that he was required to do?
A.  He denied me the medication for it.
Q.  The cream?
A.  Yes.
Q.  Told you to get it on commissary?
A.  Yeah.

Dkt. 82-1 at p. 51.

Q.  What else is Dr. Talbot doing?
A.  Once upon a time, he gave me Flonase. After I fought and fought and fought a year to get it, he gives it to me one time and then didn't renew it again. . . .

Dkt. 82-1 at p. 78-79.

In his deposition, Mr. Roberson testified he believed that Dr. Talbot was deliberately indifferent when he denied him needed medication. The only medications that could implicate a deliberate indifference claim are the Flonase for allergies and the cream for eczema. Mr. Roberson's testimony is equivocal about the reasons why any prostrate or bladder medication, and Colace for constipation, could have been discontinued. The testimony is that several different

9

medications were being tried to see what worked best. *Id.* at pp. 43 & 48. It is not deliberate indifference for a medical professional to try different medications to determine which is the most effective course of treatment. *See Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (noting that choosing different medications is not deliberate indifference unless it is a substantial departure from acceptable professional judgment). And there is no evidence that this conduct created a substantial risk of harm to Mr. Roberson that Dr. Talbot ignored.

Dr. Talbot's affidavit explains that he examined Mr. Roberson and prescribed treatment for eczema on numerous occasions: **2015**: August 28 and November 7; **2016**: June 10, September 26, November 1, 3, 11, 18, and 30; and December 6, 19, 21, and 23; **2017** : January 6, 10, 11, 17, 18, 19, 20, 24, and 25, and February 6 and 14. He was examined by Dr. Talbot and other medical providers, and was treated with Prednisone, Diprolene, hydrocortisone, Zantac, Loratidine, Triamcinolone Acetonide cream, Bactrim, Desonide, Rocephin, Eucerin, Benadryl by injections and orally, Claritin, Hibiclens soap, and Permethrin. Dr. Talbot ordered these medications, discussed the issue with Mr. Roberson, had biopsies conducted, and changed the medications when Mr. Roberson reported they did not work, all in an effort to find an effective treatment. When they concluded that Mr. Roberson's blood thinner, Coumadin, may have caused the eczema issues, it was discontinued but only after a review of Mr. Roberson's medical history. It was replaced with baby aspirin. Dkt. 84-1 at ¶¶ 136-160. Dr. Talbot's affidavit supports each statement with a citation to the medical record, dkt. 84-2.

The only evidence Mr. Roberson has designated in support of his claim that Dr. Talbot altered the medical records is Mr. Roberson's own statement. But that statement is general and speculative and amounts to an unsupported allegation. Mr. Roberson's own statement is not sufficient to demonstrate a genuine issue of material fact concerning Dr. Talbot's treatment of his

eczema. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.").[1]

If Dr. Talbot declined to provide a cream medication for Mr. Roberson's eczema, and told him to buy a cream from the commissary, it was not an act of deliberate indifference. The medical record supports the fact that Dr. Talbot did not ignore the eczema, but instead was very active in its treatment.

As to the assertion that Dr. Talbot would not prescribe Flonase, the medical records and Dr. Talbot's affidavit show that Mr. Roberson had an active prescription for Flonase from Dr. Talbot for the period June 10 to September 7, 2016. Dkt. 84-1 at ¶¶ 97-98; dkt. 84-2 at pp. 139-46. In the middle of this period, on July 22, 2016, Mr. Roberson told Dr. Talbot that his allergies were seasonal, so Dr. Talbot advised him he could purchase Claritin from the commissary. Dkt. 84-1 at ¶ 99; dkt. 84-2 at pp. 168-70. Dr. Talbot did not ignore Mr. Roberson's seasonal allergies, assuming they are a serious medical need, but treated the allergies with medication. *Id.* Mr. Roberson has not submitted evidence to suggest otherwise. There is no deliberate indifference concerning the medication Flonase.

---

[1] The basis for Mr. Roberson's allegations appears to be an incident where Dr. Talbot wrote in the medical records that Mr. Roberson refused to stay overnight in the HRU (hospital restraint unit), but Mr. Roberson wrote a note clarifying that he was not refusing. Both Dr. Talbot's statement and Mr. Roberson's note are included in the medical records. This incident is not evidence that any other records have been falsified or changed, nor does it support such an inference. *See Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999) (declining, on certain facts, to make a "reasonable inference" because it would be pure speculation). This allegation is also discussed *infra* at p. 21.

### 2.      Discontinuing needed treatments.

Mr. Roberson has not identified any needed treatment that Dr. Talbot discontinued. The amended complaint does not allege a specific treatment that was discontinued, in Mr. Roberson's deposition he did not name one, and in response to the summary judgment motions he has not provided evidence of one. There was no deliberate indifference in this regard.

### 3.      Substituting ineffective medications for effective medications.

Mr. Roberson alleges in his amended complaint that Dr. Talbot substituted effective medications with ineffective medications, but he did not include any specific instances or examples of this having occurred. Dkt. 12-1. He was not required to, as his only pleading requirement was to provide "notice pleading." Fed. R. Civ. P. 8. But at the summary judgment stage, he must designate evidence in support of his claim that creates a genuine issue of material fact, and he has not done so. Mr. Roberson did not testify as to any such medication switch in his deposition, and he has not submitted evidence to suggest that such incidents occurred. With no evidence that this conduct occurred, there was no deliberate indifference by Dr. Talbot.

### 4.      Denying the existence of Mr. Roberson's health issues.

Mr. Roberson alleges Dr. Talbot denied that Mr. Roberson had a medical condition that he actually had. The Court does not have to decide whether this could constitute deliberate indifference because Mr. Roberson has not designated any evidence in support of this allegation. *See* dkt. 90-1 (Mr. Roberson's affidavit); dkt. 91 at p. 2. Since Mr. Roberson has not designated any evidence showing that the alleged conduct occurred, there was no deliberate indifference by Dr. Talbot.

### 5.      Misdiagnosing new and chronic medical conditions.

A misdiagnosis, without more, does not establish an Eighth Amendment deliberate indifference claim. *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017). And even if it were negligence, negligence – even gross negligence – does not meet the deliberate indifference standard. Deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018) (internal quotation omitted). A plaintiff may be able to demonstrate deliberate indifference if the defendant's treatment plan was blatantly inappropriate. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). The amended complaint describes two incidents alleging a misdiagnosis. Dkt. 12-1 at pp. 3 & 4.

### a.      Misdiagnosis of Mr. Roberson's skin rash.

Mr. Roberson alleges that he had a tele-visit with a cardiologist for his atrial fibrillation, and the cardiologist recommended examinations of Mr. Roberson's thyroid and throat. *Id.* He claims that Dr. Talbot refused to have those tests done and "misdiagnosed the problem as acid reflux" without properly examining him. *Id.* This appears to be the same incident Mr. Roberson described in his deposition. In neither description of the event, however, does Mr. Roberson claim any harm or injury resulted from the alleged misdiagnosis. His diagnosis of atrial fibrillation was never changed to GERD. *See* dkt. 84-2. Furthermore, Mr. Roberson admitted in his deposition that during that event he had multiple symptoms but does not elaborate further about a misdiagnosis. These other symptoms included constipation, a gastrointestinal concern. *Id.* Mr. Roberson testified that Dr. Talbot did not know what caused Mr. Roberson's symptoms, so he suggested a proton-pump inhibitor medication (used to reduce the production of stomach acid), saying "Let's try this and see if it works. If not, then you need to go see a gastrointestinal

specialist." *Id.* at p. 55. Construing this exchange in Mr. Roberson's favor for summary judgment purposes, it still is not suggestive of a misdiagnosis of any kind.

The second incident possibly alleging a misdiagnosis concerns Mr. Roberson's skin condition. Dkt. 12-1 at p. 3-4. Mr. Roberson asserts he had a reaction to Warfarin, a blood thinner, causing a long period of severe rashes and sores. *Id.* He asserts Dr. Talbot misdiagnosed the problem as dry skin and then scabies and would not give him anything for the pain. *Id.* Dr. Talbot at one time declined to give Mr. Roberson a Benadryl injection, but when the rash and pain had worsened, a different provider at the urgent care clinic gave him the Benadryl injection. *Id.* at p. 4. Overall, the treatments ordered by Dr. Talbot, such as lotion and soap, were ineffective, but when Mr. Roberson stopped taking Warfarin the rash went away. *Id.*

Dr. Talbot's testimony describes the treatment of Mr. Roberson's rash. *See* dkt. 87 at ¶¶ 136-60. He first saw Mr. Roberson about the rash on June 10, 2016. *Id.* at ¶ 139. Dr. Talbot examined the rash, made notes, considered Mr. Roberson's evaluation of the effectiveness of past medications, and assessed the condition as atopic dermatitis/eczema. *Id.* He prescribed Prednisone. *Id.* Then in November 2016, considering Mr. Roberson's visits with nurse practitioners and another doctor, and Mr. Roberson's reports that a variety of medications were ineffective, Dr. Talbot ordered a trial of Zantac and Loratidine. *Id.* at ¶ 142. Shortly after that, Dr. Talbot also ordered Triamcinolone Acetonide cream to treat the rash. *Id.* at ¶ 143.

Mr. Roberson saw other medical providers in December 2016 and early January 2017 before seeing Dr. Talbot on January 10, 2017. *Id.* at ¶¶ 148-51. After examining the rash, Dr. Talbot took a skin biopsy and ordered Benadryl and Rocephin injections. *Id.* at ¶ 151. The doctor saw Mr. Roberson again a week later and learned that only the Benadryl injection had given him relief. *Id.* at ¶ 154. Dr. Talbot ordered three more days of Benadryl injections and a trial of

topical Hibiclens. *Id.* On January 20, 2017, Dr. Talbot saw Mr. Roberson again, ordered another "dose pack" of Prednisone, and examined the rash. *Id.* at ¶ 156. Mr. Roberson said that the Hibiclens made his rash worse, and the Benadryl and oral steroids gave him relief. *Id.* Dr. Talbot ordered more Benadryl and oral steroids and discontinued the Hibiclens. *Id.*

On January 24, 2017, Dr. Talbot discussed the biopsy report with Mr. Roberson. *Id.* at 157. Mr. Roberson thought his rash might be a parasite infestation. *Id.* Dr. Talbot therefore ordered a trial of Permethrin 5%, a medication for scabies. *Id.* But on February 6, 2017, Mr. Roberson told Dr. Talbot that the Permethrin worked at first but no longer. *Id.* at ¶ 159. A physical examination indicated the rash had subsided, with Dr. Talbot describing it as scant" and "sparsely present." *Id.* Mr. Roberson was counseled to continue using Permethrin. *Id.*

Then on February 14, 2017, Dr. Talbot saw Mr. Roberson who said that he had quit taking Warfarin on his own, for unrelated reasons, and his rash had improved. *Id.* at ¶ 160. Dr. Talbot's examination revealed the rash was 80% resolved. *Id.* Checking Mr. Roberson's medical history, he noted that Mr. Roberson had been in a normal sinus rhythm for over a year, and therefore his stroke risk was very low and no further anticoagulation medication was necessary. *Id.* Mr. Roberson signed a refusal form to stop the Warfarin, and Dr. Talbot prescribed a baby aspirin in its place. *Id.*

The gravamen of Mr. Roberson's allegations is that Dr. Talbot misdiagnosed his rash condition and caused him to suffer pain in the interim. Dkt. 12-1, pp. 3-4. The medical record and Dr. Talbot's unrebutted testimony demonstrate that Dr. Talbot, with other medical professionals, did not ignore or overlook Mr. Roberson's rash. They treated his condition with an array of medications to attempt to find resolution for him, but to no avail until Mr. Roberson seemed to

have discovered the cause of the rash on his own. On these undisputed facts, Dr. Talbot's inability to diagnose the cause of Mr. Roberson's rash was not deliberate indifference.

The Court's analysis does not end there because "blatantly inappropriate" medical treatment can be sufficient to show deliberate indifference. *See Pyles*, 771 F.3d at 409 ("A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was 'blatantly inappropriate.'" (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996))).

To demonstrate that his course of treatment for the rash was not blatantly inappropriate, Dr. Talbot presents the testimony of two other medical doctors who examined the medical record of Mr. Roberson's condition and the provided treatments:

> Dr. Talbot dealt with Mr. Roberson's rash appropriately. It was reasonable for Dr. Talbot to conclude that Mr. Roberson's rash was simply dermatitis. It is not obvious that the rash Mr. Roberson developed was a reaction to the Warfarin he was taking. It is unusual to develop a rash in response to Warfarin. Also, Mr. Roberson had a chronic rash even before he began taking Walfarin. Moreover, other medications he was taking (such as Zoloft, Amlodarone, and Prozac) were more likely to have caused his rash. In addition, the Warfarin-induced rashes I have seen usually look different than what Mr. Roberson described. Mr. Roberson's complaint that Dr. Talbot withheld Benadryl shots when more shots were needed is not legitimate because Benadryl shots for this do not make sense. Such shots are for symptomatic short-term relief, and oral Benadryl works just as well. It is apparent that Dr. Talbot made a concerted effort to do the right thing for Mr. Roberson.

Dkt. 82-2 at ¶ 11 (affidavit of Kirk Parr, M.D.).

> It is not obvious or certain that Mr. Roberson's persistent rash from 2016 into 2017 was an allergic reaction to the medication [Warfarin]. This is because Coumadin toxicity usually presents with black, necrotic tissue shortly after the patient begins taking Coumadin. Mr. Roberson never described his rash as involving black or necrotic tissue. Moreover, there are several months when Mr. Roberson was taking Coumadin and did not complain of a rash.

> Dr. Talbot's treatment of Mr. Roberson's persistent rash was appropriate. A rash is a visual diagnosis, and treating a rash can be a matter of trial and error. Dr. Talbot

16

appropriately tried many different treatments to clear up the rash and to relieve the itching and pain. Dr. Talbot reasonably tried a number of treatments, with varying degrees of success, including Prednisone (an oral steroid often prescribed for skin conditions such as redness, itching, and irritation), Triamcinolone Acetonide – 5% (a type of steroid that works by reducing inflammation and suppressing an overactive immune system), Diprolene (a corticosteroid indicated for the relief of the inflammatory and pruritic dermatoses), Bactrim (an antibiotic), at least four Benadryl (antihistamine) injections, and a Rocephin injection (used to treat bacterial infections). He also appropriately had red patches of the rash biopsied and had the dressings changed. In discussing the result of the skin biopsy, it appears from his medical records that Mr. Roberson believed he bad scabies, having been exposed to it two weeks earlier. It was reasonable and appropriate for Dr. Talbot to treat Mr. Roberson for scabies with a 5% Permethrin trial. In January of 2017, Mr. Roberson received Claritin and Benadryl, which were good choices, particularly in combination, to treat his rash. The treatments seemed to achieve some relief because when the rash was biopsied it was "scant and mild." The Permethrin seemed to work at one point, and then the rash returned. At another point, it appeared there was scant rash sparing the face and much of the extremities and sparsely on the trunk.

Dkt. 82-3 at ¶¶ 3 & 4 (affidavit of John Unison, M.D.).

Mr. Roberson has not submitted evidence to rebut Drs. Parr's and Unison's testimony so it is undisputed that Dr. Talbot's treatment of Mr. Roberson's rash was not "blatantly inappropriate." There is no deliberate indifference regarding Dr. Talbot's treatment of Mr. Roberson's skin rash.

### b. Misdiagnosis of Mr. Roberson's heart condition.

Mr. Roberson alleges that Dr. Talbot misdiagnosed his heart condition (he has a long history of atrial fibrillation) as gas and gastroesophageal reflux disease (GERD). At his deposition, Mr. Roberson clarified that his assertion centered around an incident of chest pain, but he added that there were "multiple symptoms" at the time. Dkt. 82-1 at p. 55. As noted earlier, these other symptoms included constipation, *id.*, and Mr. Roberson testified that Dr. Talbot did not know the cause. Dr. Talbot suggested a proton-pump inhibitor medication, saying "Let's try this and see if it works. If not, then you need to go see a gastrointestinal specialist." *Id.* at p. 55. It is this exchange, apparently, that is the basis of Mr. Roberson's contention that Dr. Talbot misdiagnosed his heart

condition. The amended complaint's generalized allegation of a misdiagnosis, and Mr. Roberson's

deposition testimony are the only evidence supporting this component of the claim.

In Dr. Talbot's affidavit, he testifies about an incident on September 12, 2016, where

Mr. Roberson presented with GERD symptoms. Dkt. 84-1 at ¶ 82. Dr. Talbot counseled him about

eating spicy foods, submitted a request for an outside ENT examination, and ordered an

echocardiogram. *Id.* This is apparently the incident of which Mr. Roberson complains.

In sum, there is no evidence of a misdiagnosis, of either a new condition or a chronic

condition, at the September 12, 2016, examination. Mr. Roberson's heart medications were not

changed, and no apparent injury was suffered. Dr. Talbot's affidavit details his treatment of

Mr. Roberson's heart issues. Dkt. 84-1 at ¶¶ 34-93. Dr. Talbot ordered EKGs, an echocardiogram,

laboratory tests, and x-rays, conducted physical examinations, prescribed medications, and

monitored the effectiveness of some medications. *Id.* There was no misdiagnosis or denial of

Mr. Roberson's heart condition, and no deliberate indifference because of any misdiagnosis.

### 6.    Failing to authorize or provide proper procedures and treatments for chronic health problems, causing him to suffer unneeded physical and mental pain and anguish.

In his amended complaint Mr. Roberson makes several assertions that Dr. Talbot would

not authorize proper medical care or procedures for his chronic health problems. Dkt. 12-1 at

pp. 3-4. But there are no facts pled in support of the conclusory statements. *Id.* Mr. Roberson did

not respond to the defendants' motions for summary judgment with evidence of such conduct.

Having examined Mr. Roberson's deposition testimony, the Court is not aware of any specific

evidence to support this claim. Dkt. 82-1. Mr. Roberson testified that Dr. Talbot delayed sending

him to a cardiologist, but he does not testify to an injury caused by the delay. *Id.* at p. 15. He

asserted that an unnamed eye doctor recommended eye surgery, but Wexford would not authorize

18

the surgery. *Id.* He does not make this claim against Dr. Talbot, but Wexford, and regardless he does not have evidence of such occurrence, which was raised for the first time in the deposition. *Id.* & dkt. 12-1 at p. 27. The treatment of Mr. Roberson's skin condition was addressed above. There are few, if any, factual assertions about Mr. Roberson's allergies, sore throat, diaphragm, prostate, bladder, or thyroid, *see* dkt. 12-1 at p. 2, but no claim of injury. While Mr. Roberson claims he was unnecessarily kept in pain, he has not attributed that pain to any incident of deliberate indifference.

Even if a plaintiff can show deliberate indifference, to recover on the claim the plaintiff must have an injury. "[T]here is no tort – common law, statutory, or constitutional – without an injury, actual or at least probabilistic." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) (a plaintiff must show some cognizable harm, whether physical or psychological); *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) (a § 1983 claim for money damages must allege an actual injury). More specifically, because Mr. Roberson's claims concern *delayed* medical treatments, examinations, and tests, he "must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams v. Liefer*, 733 F.3d 786, 790 (7th Cir. 2013). Mr. Roberson fails to offer any medical evidence that Dr. Talbot's alleged delays in treatment caused him detriment.

Mr. Roberson has not shown deliberate indifference on this assertion.

### 7.   Providing improper care.

Mr. Roberson also alleges that Dr. Talbot has provided improper care or improper "non acts." Dkt. 12-1 at p. 4. While possibly attempting a separate claim for "improper care", this assertion is duplicative of the description Mr. Roberson uses to describe Dr. Talbot's medical

services. Mr. Roberson's specific claims have been addressed. This "sub-claim" does not warrant a separate analysis.

8.      **Denying care/treatment.**

Mr. Roberson also asserts that Dr. Talbot denied medical care and treatment. Dkt. 12-1 at p. 4. As has been repeatedly noted, Mr. Roberson provided no specific allegations of any denial of any treatment or care in his amended complaint, and has not submitted any in his summary judgment response. *See* dkts. 90 & 91. To the extent Mr. Roberson makes this claim concerning treatment for his rash, that issue has been discussed above.

If this contention concerns Mr. Roberson's assertion that Dr. Talbot would not allow him to see a cardiologist, that claim has no merit. First, Mr. Roberson has alleged no injury or detriment from a delay in seeing a cardiologist. Additionally, he did see Dr. Ross, a cardiologist, once in person and several times by video, and continued to take the medication recommended by Dr. Ross. Dkt. 82-1 at pp. 33-38. After Dr. Ross passed away, Mr. Roberson received several EKGs, but none were abnormal because, according to Mr. Roberson, they were administered while he was not in distress. *Id.* at p. 36. Finally, when asked what symptoms his atrial fibrillation caused that were not being addressed, Mr. Roberson could not state one, instead saying that he was "not sure if AFib is causing all kinds of different things." *Id.* at p. 37. Again, he has not had an atrial fibrillation issue that caused him to go directly to the healthcare until since 2015. *Id.* at p. 41.

On the summary judgment record, there is no evidence of any delay in treatment that could amount to deliberate indifference.

9.      **Delaying and denying examinations by a specialist (in particular a cardiologist, Dr. Edward Ross).**

The immediately preceding discussion addressed Mr. Roberson's claim of delays in seeing a cardiologist. Assuming there was a delay in seeing Dr. Ross during Dr. Talbot's tenure at PCF,

Mr. Roberson has suffered no compensable injury and thus does not have a constitutional claim. The same is true for any delay seeing an ENT or gastroenterologist. Mr. Roberson alleges that he had to work hard and make several demands to see specialists, but in the end he was referred to specialists and cannot point to any injury caused by delay. *See* dkt. 82-1.

### 10.     Entering false or misleading information about Mr. Roberson's medical conditions into his medical file to cover his deliberate and negligent actions.

Dr. Talbot asserts that the only allegation of false information being placed into Mr. Roberson's health record concerns whether Mr. Roberson had refused to stay in a Hospital Restraint Unit (HRU) for observation. Mr. Roberson claimed that Dr. Talbot placed a false note in the medical record that he had refused to stay overnight in the HRU, but Mr. Roberson had not refused. Dkt. 87 at p. 61. Dr. Talbot asserts that even if this allegation is true, it has no relevance to whether Dr. Talbot was deliberately indifferent to any serious medical need of Mr. Roberson's. The Court agrees that this issue has little, if any, evidentiary value in the context of the claims Mr. Roberson asserts in this case.

Mr. Roberson testified in his deposition that Dr. Talbot deliberately wrote in his medical records that his prostate and bladder "are fine" when in truth they are not. Dkt. 82-1 at p. 44. As with other contentions, there is no evidence other than Mr. Roberson's assertion to suggest that this event occurred or, more importantly, that it caused harm to Mr. Roberson. Mr. Roberson has not designated evidence showing there was anything wrong with his prostate or bladder.  And when referring to his bladder and/or prostate at his deposition, Mr. Roberson testified that, "[w]e've not discovered what that issue is," *id.* at p. 14, and concerning unspecified issues, "I'm not entirely sure it's the prostate," *id.* at p. 42.

On this record, if Dr. Talbot had written that Mr. Roberson's bladder and prostate were "fine," there would be no evidence to demonstrate that the notation was wrong. Mr. Roberson's claim is without merit.

**11.    Only ordering baseline tests performed on site instead of the tests required to determine the seriousness of Mr. Roberson's heart condition.**

This claim fails because Mr. Roberson cannot show how he has been injured or harmed by not immediately being given more comprehensive medical tests.

It bears noting, though, that a decision to forego certain diagnostic testing for simpler testing is "a classic example of a matter for medical judgment," *see Estelle v. Gamble,* 429 U.S. 97, 107 (1976), and not relevant to a deliberate indifference claim.

**12.    Threatening to lock up Mr. Roberson to cover his own bad acts and following up on such threats.**

There is no evidence in the summary judgment record, other than Mr. Roberson's conclusory testimony, to show that Dr. Talbot threatened to "lock up" Mr. Roberson to cover up his own bad acts. But taken as true for summary judgment purposes, the contention does not support a constitutional claim because it has nothing to do with the delivery of medical care. In other words, whether or not Dr. Talbot threatened Mr. Roberson with lock-up has no relevance to whether the doctor was deliberately indifferent to Mr. Roberson's serious medical needs. This contention has no merit.[2]

---

[2] Mr. Roberson has not alleged a First Amendment retaliation claim. If he had, it nevertheless would be meritless because Dr. Talbot's alleged threats to lock-up Mr. Roberson were not made because of Mr. Roberson's exercise of a protected First Amendment activity, but to – allegedly – cover up Dr. Talbot's mistakes.

## V. Conclusion

A prison inmate is entitled to *adequate* medical care, *Farmer*, 511 U.S. at 832, and that is what Mr. Roberson received. An inmate cannot demand specific care and is not entitled to the best care possible. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2004); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999). The undisputed summary judgment evidence demonstrates that the defendants were not deliberately indifferent to Mr. Roberson's serious medical needs. The defendants' motions for summary judgment, dkt. [80] and dkt. [83], are **granted**. Final judgment consistent with this Order shall now enter. This action is **dismissed** with prejudice.

**SO ORDERED**.

Date: 5/14/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Paul Roberson
218764
Pendleton Correctional Facility
Electronic Service Participant – Court Only

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
Bleeke Dillon Crandall Attorneys
jeb@bleekedilloncrandall.com

Mario Garcia
Brattain Minnix Garcia
mario@bmgindy.com

Mary L. Graham
Bleeke Dillon Crandall Attorneys
mary@bleekedilloncrandall.com

Terry Wayne Tolliver
Brattain Minnix Garcia
Terry@BMGIndy.com